[618 NYS2d 772]

DAMION RODRIGUEZ, an Infant, by His Mother and Natural Guardian, SAVERINA GALVAN et al., Respondents, v OAK POINT MANAGEMENT, INC., Appellant, et al., Defendants.

First Department, November 15, 1994

## APPEARANCES OF COUNSEL

*Jonathan R. Walsh* of counsel *(William K. Capshaw,* attorney), for appellant.

*James P. McCall* of counsel *(Joseph T. Mullen, Jr.,* attorney), for respondents.

## OPINION OF THE COURT

Tom, J.

This is a personal injury action arising out of a shooting outside a residential building which is alleged to be the site of extensive illegal drug activities.

Plaintiff Damion Rodriguez, an infant of the age of 14 at all times relevant herein, was attending his cousin's birthday party on June 16, 1990 at his aunt's apartment, which is located in the building designated as 515 West 170th Street, New York, New York (the Building). Defendant-appellant Oak Point Management, Inc. (Oak Point) is a domestic corporation which owns and operates the Building.

Plaintiff arrived at his aunt's apartment at approximately 3:40 P.M. and remained there for a short time until his aunt requested that he go to a nearby bodega to purchase cake and plates for the party. Plaintiff left the apartment with his infant cousin, Demetrio Espinosa, and proceeded to the store.

During an examination before trial conducted on July 17, 1991, plaintiff testified that he saw a group of people hanging out in front of the Building when he first arrived at the party and also when he had left to go to the store. Plaintiff averred that he believed the people were drug dealers because he observed individuals who looked like drug addicts and saw two of the men exchange a small package.

As plaintiff and his cousin returned to the party from the bodega, plaintiff testified that he saw one of the men whom he had noticed earlier in the loitering group run inside the Building, reemerge with a handgun, and begin firing at two men in the direction of him and his cousin. Plaintiff stated that he heard shots and was struck in the right side by a single bullet. Plaintiff was subsequently rushed to the hospital where he underwent emergency surgery for his injuries during which his spleen was removed.

Plaintiff commenced the underlying action by the service of

summons and complaint in or about July 1990 and subsequently served two amended complaints. Discovery was conducted and, based primarily on the deposition of plaintiff, defendant moved for summary judgment on or about April 16, 1993. The IAS Court denied the motion noting, *inter alia,* that there were allegations that the gunman had been a regular occupant of the environs of the Building, where he conducted a drug-dealing operation, and that issues of fact existed as to the foreseeability of the incident in which plaintiff was injured. Defendant now appeals and we affirm.

In order to establish a prima facie case of negligence, the plaintiff must demonstrate: (1) a duty owed by defendant to plaintiff; (2) a breach of that duty; and (3) an injury suffered by plaintiff as the result of that breach *(Solomon v City of New York,* 66 NY2d 1026, 1027; *Akins v Glens Falls City School Dist.,* 53 NY2d 325, 333).

It is now well established that a party who possesses realty, "either as an owner or as a tenant, is under a duty to exercise reasonable care under the circumstances to maintain the property in a safe condition, including the undertaking of minimal precautions to protect members of the public from the reasonably foreseeable criminal acts of third persons" *(Provenzano v Roslyn Gardens Tenants Corp.,* 190 AD2d 718, 720; *Vangeli v Schneider,* 194 AD2d 916, 917; *Newell v Swiss Reassurance Co.,* 181 AD2d 505, 506; *Carroll v Ar De Realty Corp.,* 167 AD2d 216; *Iannelli v Powers,* 114 AD2d 157, *lv denied* 68 NY2d 604).

The duty to take minimal protective measures arises when it is shown that the party possessing the property "either knows or has reason to know from past experience 'that there is a likelihood of conduct on the part of third persons * * * which is likely to endanger the safety of the visitor' " *(Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 519, quoting Restatement [Second] of Torts § 344, comment *f; see also, Gill v New York City Hous. Auth.,* 130 AD2d 256, 262; *Hendricks v Kempler,* 156 AD2d 425, *lv denied* 77 NY2d 808; *Iannelli v Powers, supra,* at 161).

In the case at bar, plaintiff's aunt, Marcelina Espinosa, in an affidavit dated June 8, 1993, stated that numerous, repeated complaints were made to the landlord concerning the general lack of security, the broken front door lock, and the constant drug dealings in the halls and lobby of the Building. Plaintiff testified that upon arriving at the Building he noticed

that the lock on the front door was broken; and that he had seen the same people involved in the shooting loitering inside and outside of the Building on prior occasions engaged in what he believed to be the sale of drugs.

Oak Point's President, a Mr. James Bell, testified at an examination before trial conducted on July 17, 1991, that he was aware drug dealing was occurring in the Building, specifically with regard to Apartment 45. Plaintiff's cousin stated that he thought the shooter had some connection with Apartment 45. It appears that defendant did not contact the New York City Police concerning the illegal activity until after the incident in question.

It has been further held that "a landlord's failure to maintain locks *(see, Miller v State of New York,* 62 NY2d 506]), or to post security personnel at entrances *(see, Nallan v Helmsley-Spear, Inc., supra),* or to provide adequate lighting in places where criminals are known to lurk *(see, Loeser v Hale Gardens,* 73 AD2d 187) may constitute negligence for which the landlord can be held accountable." *(Gill v New York City Hous. Auth., supra,* at 262-623; *see also Waters v New York City Hous. Auth.,* 69 NY2d 225.)

Numerous issues of fact exist concerning the shooter's connection to the Building, his involvement in drug-dealing activities, the failure of defendant to act once it was placed on notice of the various illegal activities and inadequate security measures; and whether defendant's actions, or failure to act, were a proximate cause of plaintiff's injuries. All of the foregoing, in our view, are within the province of the jury.

While we are aware that plaintiff was not on defendant's premises when he was injured, that is but one of many factors that has to be taken into account in determining whether the risk of harm to plaintiff was foreseeable under the particular circumstances of this case.

Plaintiff was an invitee of a tenant of the Building when he was shot. He had entered the Building and was requested by the tenant to run an errand. Plaintiff was returning directly to the Building from that undertaking when he was struck by the bullet at a location approximately one-half block away from the Building and on the same side of the street. Plaintiff would not have been at that site if not for the fact that he was an invitee of defendant's tenant.

Plaintiff has offered ample proof not only to show that the shooting emanated from defendant's premises and was relat

to the constant drug activities occurring in the common areas of the Building but also that the landlord had notice of those activities and failed to act. Plaintiff also asserts that the gunman had frequently sold drugs in the Building, and plaintiff testified that he observed the gunman enter the Building and shortly thereafter reemerge with a gun and begin firing. Plaintiff and his cousin both testified that the shooter was approximately five steps (or approximately five feet) from the front of the Building when he opened fire in their direction. There was some speculation, albeit unconfirmed, that the men being shot at had been involved in some sort of robbery, which was possibly drug related.

Indeed, under the facts and circumstances of this case, the plaintiff's injuries may be found by a jury to be readily foreseeable. Unfortunately in the world in which we now live, the drug culture, and its attendant brutality and violence, are a part of everyday life. It is rare for a day to pass without some news concerning a shooting over a drug deal gone bad or resulting from the encroachment by one dealer into another dealer's territory and it is often the innocent bystander, including many instances involving children, who is injured or killed. If, in fact, defendant was aware of the constant drug dealings and the lack of security in its Building and allowed it to continue with impudence, it may be readily foreseeable that an injury to, or the death of, a tenant or invitee would eventually result as such was " 'clear to the ordinarily prudent eye' " *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 344, quoting *Munsey v Webb,* 231 US 150, 156).

Further, there is no need for the criminal conduct in question to be of the same type as that to which the plaintiff was subjected in order to establish foreseeability *(Jacqueline S. v City of New York,* 81 NY2d 288, 294-295; *Splawn v Lextaj Corp.,* 197 AD2d 479, *lv denied* 83 NY2d 753).

The defendant's, as well as the dissent's, reliance on *Muniz v Flohern, Inc.* (77 NY2d 869) is misplaced. The facts in the *Muniz* case are readily distinguishable from the facts herein. In *Muniz (supra,* at 870), the Court of Appeals held that: "There was no relationship between defendants and the gunman who robbed the streetfront store of their building. *Nor was there any relationship between the attempted robbery and the illicit drug activity* such as to require defendants to attempt to control the conduct of either the tenant or the gunman. Moreover, there was no relationship between defendants and the infant plaintiff requiring defendants to afford

protection from potential dangers springing from the tenant's illicit drug trafficking in the [defendants' building]." (Emphasis added.)

In the matter before us, however, a relationship did exist between defendant and plaintiff as plaintiff was a legal invitee to the Building who was simply returning to defendant's property when the incident occurred. Plaintiff was not, as in *Muniz (supra),* simply passing by the Building. Further, unlike in *Muniz,* here allegations existed associating the shooter with the Building and its illegal activities for a long period of time. Those activities and the shooter's presence may very well have been facilitated by the lack of security or a functional front door lock on the Building.

Accordingly, the order of the Supreme Court, New York County (Alan Saks, J.), entered on or about January 24, 1994, which denied Oak Point's motion for summary judgment, is affirmed, without costs.

NARDELLI, J. (dissenting). Plaintiff Damion Rodriguez, then aged 14, was sent by his aunt, who was giving a "get together" at 515 West 170th Street, to buy some cake plates. When he left 515 there were men outside the building; Damion had seen one of them passing a small packet to another and believed they were selling drugs. When Damion was returning from the store and was 191 feet away (161 feet from the building line of 515) he saw one of the men emerge from 515, stand a few feet from the entrance to 515, and fire a gun. One of the bullets hit Damion in the side. The building at 515 is owned by defendant-appellant.

The motion court concluded that certain issues of fact were unresolved. Assuming, however, that there were drug-dealing activities within the building, that the locks on the front and basement doors did not work and defendant landlord knew of their condition, that the gunman used the building in his drug-dealing and other activities, and even that he had entered the building to get the gun, there would be no basis for imposing liability on defendant. No duty running to plaintiff Damion could be shown to exist. To say, as does the majority, that the infant plaintiff's subjective intention to return to defendant's property can serve as a basis for the creation of a relationship that imposes liability on defendant is patently absurd. In that regard, the infant plaintiff is no different from any other passerby. Thus, there could be no violation of a duty on which to base liability. In *Muniz v Flohern, Inc.* (77 NY2d

869), a nine-year-old boy passing on the sidewalk was hit by a shot from inside a store in the building while the store, which was allegedly known for illegal drug activities, was being held up. The Court of Appeals upheld the dismissal of the action as against the landlord, noting that the landlord "owed no duty to the infant plaintiff" *(supra,* at 870) and that there was no relationship between the landlord and the gunman, "between the attempted robbery and the illicit drug activity such as to require defendants to attempt to control the conduct of either the tenant or the gunman" *(supra,* at 870), or between the landlord and the infant plaintiff requiring the landlord to afford him protection from potential dangers springing from the drug trafficking.

In the instant case, also, no relationships are suggested which could create a duty in the landlord to plaintiff, especially with respect to a shot fired from a public sidewalk and striking plaintiff more than the width of a football field away from the building. *Waters v New York City Hous. Auth.* (69 NY2d 225, 230) also found no duty in the building owner even though a crime initiated in the street was continued onto the property; the Court of Appeals observed that virtually limitless liability would be imposed on property owners if their legal obligations were extended in those circumstances, and said "both logic and public policy weigh heavily in favor of confining the scope of defendant landowner's duty to protect against criminal acts to tenants and others who might reasonably be expected to be on the premises" *(supra,* at 230).

In considering liability to people *off* the premises—in this case 161 feet off the premises—we must be especially conscious of Chief Judge Cardozo's observations that "[t]he risk reasonably to be perceived defines the duty to be obeyed" and that one "sues for breach of a duty owing to himself" *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 344, 346). The gunman undoubtedly violated a duty to anyone within the range of his weapon, including plaintiff, since the risk of a person's being hit could reasonably be perceived. To impose a similar duty of foresight upon a building owner because a concatenation of circumstances and events resulted in the gunman's entering and emerging from its building before firing his weapon, however, would impose liability for a risk *not* "reasonably to be perceived." Firing a gun on a city street is so inherently dangerous "as to impose a duty of prevision not far from that of an insurer" *(Palsgraf v Long Is. R. R. Co., supra,* at 344). The decisions in *Muniz (supra)* and *Waters (supra)* reflect the

circumstance that our law does not make property owners insurers.

Accordingly, I respectfully dissent and vote to reverse the order appealed from and to grant summary judgment dismissing the complaint as against defendant-appellant.

CARRO and WILLIAMS, JJ., concur with TOM, J.; SULLIVAN, J. P., and NARDELLI, J., dissent in a separate opinion by NARDELLI, J.

Order, Supreme Court, New York County, entered on or about January 24, 1994, affirmed, without costs.